1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10    KYLE LEE PAYMENT,

11                          Plaintiff,

       v.

12    RYAN PUGH,

13                          Defendant.

14

CASE NO. 3:22-cv-05569-TL-GJL

REPORT AND RECOMMENDATION

Noting Date: November 10, 2023

15        This matter is before the Court on referral from the district court and on: (1) Defendant's

16    motion for partial summary judgment dismissing Plaintiff's retaliation claim; and (2) Plaintiff's

17    motion for partial summary judgment as to liability for both of his claims—for retaliation and

18    excessive use of force. Dkts. 26, 29. For the reasons discussed below, the Court recommends that

19    both parties' motions be **DENIED**.

20                          I.        **BACKGROUND**

21        Plaintiff, a prisoner proceeding *in forma pauperis* who is currently confined at the

22    Monroe Corrections Center, brings claims under 42 U.S.C. § 1983, arising out of events that

23    occurred while he was confined in the Intensive Management Unit ("IMU") at the Washington

24

Corrections Center ("WCC"). Dkt. 24. Plaintiff, through counsel, initiated this matter on August 5, 2022, alleging two WCC Corrections officers—Officers Ryan Pugh and Eric Wulf—retaliated against him for filing a grievance. Dkt. 5. Plaintiff subsequently amended his Complaint to remove Officer Wulf as a Defendant; his Amended Complaint, the operative Complaint in this matter, alleges claims only against WCC Correctional Officer Ryan Pugh. Dkt. 24.

Plaintiff's Amended Complaint alleges Defendant Pugh retaliated against him on October 4, 2019, after Plaintiff had filed a grievance the previous day, complaining that Plaintiff's recreation (or "yard") time on October 3, 2019, had been cut short. Dkt. 24. Plaintiff alleges he filed his grievance by submitting it directly to Defendant, and that Defendant retaliated against him the next day in violation of his First Amendment rights by: (1) again prematurely terminating his yard time; (2) using excessive force against him while his handcuffs were being removed after his placement in a holding cell: and (3) filing a false Serious Infraction Report, which was ultimately resolved in Plaintiff's favor. *Id*. Plaintiff also alleges Defendant violated his Eighth Amendment rights by exerting excessive force during the handcuff removal process, which was captured on surveillance video. *Id*. Plaintiff seeks compensatory and punitive damages, attorneys' fees and costs. *Id*. at 8.

The parties do not dispute that Plaintiff filed a grievance on October 3, 2019, nor that Plaintiff responded to his perceived loss of additional yard time on October 4, 2019, by engaging in self-harm, after which he was escorted to a holding cell to await medical treatment. Further, the parties agree that during the process of removing Plaintiff's handcuffs through the opening in the door of the holding cell known as the "cuff port," Defendant pulled sharply on the handcuff tether and/or Plaintiff's arm—pulling Plaintiff's arm out and upward in a technique referred to by Defendant as a "gooseneck." *See* Dkt. 35-1 at 19; Dkt. 31 at ¶ 12.

It is also undisputed that, after viewing surveillance video of the handcuff removal incident, the Hearing Officer found Defendant's narrative in the Serious Infraction Report conflicted with both the video and the report from Officer Wulf—and Plaintiff was found not guilty of the infraction. Dkt. 30-1 at 6.

However, the parties' evidence diverges on many other points, and is discussed separately below. The Court also summarizes below its observations from viewing the surveillance video.

**A.    Plaintiff's Evidence**

Plaintiff has submitted two Declarations, as well as deposition testimony of Defendant and two fellow Corrections Officers, Eric Wulf (who was present during the actions at issue) and Kenneth Nonamaker (who reviewed video of the handcuff removal incident). Dkts. 31, 37, Dkt. 30-1 at 9–14 (Wulf Dep.), 21–28 (Nonamaker Dep.); Dkt. 40-2 at 6–10 (Plaintiff Dep.). Plaintiff has also submitted the Serious Infraction Report filed by Defendant, the Disciplinary Hearing Minutes and Findings holding Plaintiff not guilty of the infraction, prison officials' response to his grievance, and Officer Wulf's Incident Report. Dkt. 30-1 at 4, 6; Dkt. 40-3; Dkt. 40-4 at 2. In addition, Plaintiff has submitted surveillance video from both outside and inside the holding cell where the use of force incident occurred. Dkt. 30, Ex. E.[1]

Plaintiff states that he was required to return from his recreation time on October 3, 2019, before the expiration of the hour to which he was entitled. Dkt. 31 at ¶ 2. He filed a grievance about this which he states he submitted by handing the grievance directly to Officers Pugh and Wulf, pursuant to IMU procedures; Plaintiff states that he observed Defendant reading the grievance after Plaintiff handed it to him. *Id*; Dkt. 37 at ¶ 4. Plaintiff states that when he

---

[1] For security reasons, the Court has granted Plaintiff's unopposed motion that the video be sealed. Dkt. 41.

confronted Defendant about the early termination of his recreation time, Defendant said "Maybe you shouldn't file your dumb-ass grievances and you wouldn't have this problem." Dkt. 31 at ¶ 3.

Plaintiff states that the next day, October 4, 2019, his recreation time was again ended early, by ten minutes. *Id*. at ¶ 4. Plaintiff testified at his deposition that he was aware of this timing because he could view a clock from the yard. Dkt. 27-1 at 8. Plaintiff states that, in his experience, prisoners are usually returned to their cells in the order in which they have been taken out to the yard—that is, the first prisoner taken to the yard is usually the first to be returned. Dkt. 37 at ¶ 3. But on both days, Plaintiff asserts he was the last prisoner to go out, but the first to be returned.  Dkt. 27-1 at 8.

When Defendant and Officer Wulf attempted to escort Plaintiff back to his cell on October 4, 2019, Plaintiff objected and states that he asked to speak to a unit supervisor. Dkt. 31 at ¶ 6. When this was refused, Plaintiff began to self-harm by banging his head on the yard door, resulting in a wound to his head. *Id*. at ¶ 7. Defendant and Officer Wulf then handcuffed Plaintiff and escorted him to a holding cell. *Id*. at ¶ 10.

Plaintiff states that, upon arriving at the cell, he entered as instructed, turned around so his back was to the cuff port and inserted his hands into the port. *Id*. at ¶ 11. The handcuff was then removed from Plaintiff's left hand, and he moved that hand into the cell to wipe his brow. *Id*. Plaintiff states that "without provocation, and without providing me with any commands," Defendant then "began yanking on the tether" connected to the right handcuff. *Id*. This action pulled Plaintiff's arm through the cuff port and "contorted [Plaintiff's arm] in ways that were unnatural." *Id*. Plaintiff reports that he experienced "excruciating pain" and received a large

bruise on his arm. *Id*. at ¶ 12. After the right handcuff was removed, Plaintiff again engaged in self-harm, banging his head against the cell door. *Id*. at 13.

It is undisputed that on the same day, Defendant filed an Initial Serious Infraction Report accusing Plaintiff of "704" and "717" rule violations. Dkt. 30-1 at 4. The parties agree that the charged violations were for staff assault and threatening staff injury. Dkt. 30-1 at 13 (Wulf Dep.); Dkt. 27-1 at 17 (Defendant's Dep.). Defendant's narrative in the Infraction Report states in pertinent part as follows:

> As soon as the door closed on the H3 holding cell I/M [P]ayment started to yell again and pull against the restraints which were tethered to the bar welded onto the outside of the door. As soon as I took I/M Payment[']s left hand restraint off he tried to pull his right arm into the cell. As I was reaching for his right arm he grabbed me and then I applied a gooseneck. I/M Payment tried to hit me through the cuff port and was grabbing my hand.

Dkt. 30-1 at 4.

It is undisputed that the Hearing Officer, after watching the surveillance video, found Plaintiff not guilty and noted as follows:

> The description narrative does not match up with the video evidence. I did not observe any actions by I/M that would constitute a violent action directed toward unit staff. I did not observe him grab hold of staff's arm. Did not observe him trying to strike staff.
> . . .
>
> The video evidence and description narrative conflict I/M [illegible] and testimony. The infraction narrative and incident report from C/O Wulf also conflict.

Dkt. 30-1 at 6.

Defendant Wulf submitted an Incident Report that describes the cuff port incident as follows:

> Officer Pugh remained in control of the cuff retainer, and utilized control tactics to ensure staff safety. I/M Payment's address book was in his right hand and [he] began to become even more agitated as I took his address book from his right

hand. The right restraint was then removed. Once wrist restraints were removed, the cuff port was secured.

Dkt. 40-4 at 2. Officer Wulf testified at his deposition that he "did not observe" a staff assault.

Dkt. 30-1 at 13. He further testified:

> So from what I observed, it looked like Payment was compliant with the restraint-removal procedure. There would be no reason, in my mind, for him to pull back on the restraint at the time or to apply a gooseneck or to do anything of that sort because I didn't physically observe any sort of action on Payment's behalf that would merit the actions of Pugh.

Dkt. 30-1 at 14.

Finally, Officer Nonamaker testified that he responded to the incident after he heard yelling, with Plaintiff ostensibly crying out in pain and Defendant exclaiming "[q]uit resisting." Dkt. 30-1 at 23. After reviewing the videos, Officer Nonamaker concluded that the event "seemed to be more of what Payment said than what Pugh was saying." *Id*. After viewing the videos again during his deposition, Officer Nonamaker testified that he saw Plaintiff put his hands out the cuff port to have the restraints taken off, and "it appears he was pulled through the cuff port." *Id*. at 26. Officer Nonamaker did not see Payment do anything improper "that could result in a use of force like that [.]" *Id*. at 26. Officer Nonamaker further testified that the cuff tether is "only to be used if an inmate tries to take your restraints" and is not properly used for any other purpose. *Id*.

## B.    Defendants' Evidence

Defendant relies upon deposition testimony from himself, Officer Wulf and Plaintiff, and has submitted a Declaration from WCC Correctional Captain Ryan S. Rubacalpa.

Defendant notes that Plaintiff admitted he has been incarcerated continually for 23 years, and has incurred fifteen additional convictions for custodial assaults against prison staff. Dkt. 27-1 at 3, 5. Of Plaintiff's 23 years of incarceration, 19 have been spent in IMU. *Id*. at 12.

1    Defendant testified that, based upon ordinary turnaround times, he would normally not be

2    aware of a grievance filed against him until approximately one week after it had been filed. Dkt.

3    27-1 at 18–19. Officer Wulf, similarly, testified he did not know about Plaintiff's October 3,

4    2019, grievance on the next day, and probably learned about it one week later. *Id*. at 25.

5    Defendant also denies that he told Plaintiff not to file grievances—and testified that did not talk

6    to Plaintiff about filing grievances for any purpose. Dkt 27-1 at 19.[2] Defendant also denies that

7    he retaliated against Plaintiff. Dkt. 35-1 at 25.

8    Defendant testified that he was working as a floor officer on October 4, 2019. Dkt. 35-1

9    at 26. According to Defendant, the booth officer—not the floor officer—keeps track of an

10    inmate's recreation time. *Id*. at 26. The Booth officer informs the floor officers when it is time to

11    take an inmate back to his cell. *Id*. Defendant testified that he did not know how much time had

12    elapsed while Plaintiff was in the yard. *Id*. at 27. He testified he did not choose to end Plaintiff's

13    yard time early and was not involved in keeping track of Plaintiff's yard time in any way. *Id*.

14    Defendant also submitted the Declaration of Correctional Captain Rubalcaba, which

15    states that IMU doors are controlled by the booth officer. Dkt. 28 at ¶ 4. When the doors are

16    opened, the prison computer system identifies the time and purpose for the opening, and it then

17    tracks the time that has elapsed since opening. *Id*. at ¶ 6. This is the standard procedure for

18    tracking an inmate's time out of the cell. *Id*. The booth officer then notifies the floor officers

19    when an individual's yard time is up; floor officers like Defendant do not count, control or

20    monitor yard time. *Id*. at ¶¶ 7, 8. Thus, according to Captain Rubalcaba, Defendant would not

21    have had the ability to cut Plaintiff's yard time short. *Id*. at ¶ 9.

22

23    _____

[2] Defendant's brief asserts that Defendant Wulf also denied hearing any such statement. Dkt. 34 at 4. But
Defendant's record citation is to page 61 of Defendant's deposition, which does not address that topic. Dkt. 27-1 at
17. The Court has not located page 61 of Officer Wulf's deposition in the record. *See* Dkts. 27, 35.

24

Defendant states that on October 4, 2019, Plaintiff objected when Defendant went to the yard to retrieve him by slamming his head into the yard door and injuring himself. Dkt. 35-1 at 17–18. Defendant and Officer Wulf decided to move Plaintiff to a holding cell to receive medical attention. *Id*. During his escort to the holding cell, Plaintiff "was cursing" Defendant and Officer Wulf, complaining that his yard time had been cut short, but was otherwise "pretty compliant." *Id*. at 18. Defendant states that he put Plaintiff in the holding cell and, together with officer Wulf, closed and locked the door. *Id*. Defendant instructed Plaintiff to put his hands back through the handcuff port, which he did. *Id*. While officer Wulf had hold of the handcuff tether, Defendant removed the left handcuff. *Id*.

Defendant then testified to the following narrative of what happened next:

> And at that point he pulled his right hand restraint in. Or it seems like he tried to. He pulled his right hand in. Either way, his hand was no longer breaking the plane of that cuff port, so he was essentially pulling the handcuffs in there.
>
> So we gave a tug on the handcuff tether. His hand came out. I grabbed his hand— his right hand and arm. I told him to stop resisting. He ignored that. That's when I put his—was able to put his right hand in a gooseneck.

Dkt. 35-1 at 18–19. Defendant later clarified that while Officer Wulf was originally holding the tether, "I grabbed a hold of the tether when [Plaintiff] pulled his hand inside." *Id*. at 20. When asked whether Plaintiff tried to strike him, Defendant responded:

> No. He—he tried—he pinched the top of my hand as I was trying to get a hold of his hand, but I don't –I don't think he tried to punch me or strike me or kick me or anything."

*Id*. Defendant stated he did not know whether Plaintiff pinched with his right or his left hand. *Id*. Defendant stated that when he referred to Plaintiff "assaulting" him, he was referring to Plaintiff pinching the top of his hand. *Id*. at 21. This account differs from Defendant's narrative in his Serious Infraction Report, which states Plaintiff "tried to hit me through the cuff port and was grabbing my hand." Dkt. 30-1 at 4.

1    Defendant testified Plaintiff's right hand was "hovering just about at the plane of the

2  handcuff port" and Defendant "was fighting [Plaintiff] for control of his hand at the handcuff

3  port." *Id*. at 22. Defendant states that he employed force because "I just wanted to get the

4  handcuff back and have [Plaintiff] looked at." *Id*. at 31. Defendant states he was attempting to

5  restore security and did not enjoy using force. *Id*.

6    Defendant also submitted deposition testimony in which Officer Wulf described the

7  escort and handcuff removal. Officer Wulf reported Plaintiff was upset and claimed his yard time

8  had been shorted, and asked to speak to a sergeant. Dkt. 35-1 at 35. Officer Wulf did not tell

9  Plaintiff he could not do so. *Id*. at 36. Once they arrived at the holding cell, Officer Wulf assisted

10  in securing the door, and Plaintiff "put his wrists through the cuff ports [s]o we could remove the

11  wrist restraints." *Id*. The handcuff tether had been passed through the cuff port before closing the

12  door. *Id*. After the left handcuff was removed, Plaintiff brought his left arm into the cell. *Id*. at

13  38. Officer Wulf noticed Plaintiff was holding something in his right hand, and because of

14  Plaintiff's self-harm behavior decided he needed to remove it. *Id*. Officer Wulf states he

15  "grabbed" the item, which he later determined was an address book and pen, from Plaintiff's

16  right hand. *Id*. He testified that Plaintiff got upset, but he explained it was normal procedure. *Id*.

17  Officer Wulf was able to remove the items from Plaintiff's hand because Plaintiff's hand was

18  "already through the cuff port." *Id*. at 39.

19  **C.    Videos**

20    Plaintiff submitted two videos from prison surveillance cameras. *See* Ex. E to Dkt. 30.

21  The following is a summary based upon the Court's review.[3]

22

23

24  _____

[3] Time references are to the date and time stamp in the upper left-hand corner of each video.

1

2

3

4

5

6

7

8

9

10

     The first video, labelled "PROD 00000125," depicts the hallway and exterior of the holding cell. There is no sound. The camera placement permits a clear view of the cell-front, but its distance prevents a detailed view of the cuff port. At timestamp 9:03:47, an inmate in white coveralls is escorted down the hallway by two officers dressed in dark uniforms. From 9:04:00–:04, the inmate enters the cell, the tether attached to his handcuffs is passed through an opening in the door (the cuff port), and the officers jointly close and secure the door. At timestamp 9:04:11–12, the officer on the left is working at the port, while the officer on the right loops the tether through a bracket on the door. The activity of the officer on the left appears consistent with the testimony of Defendant and Officer Wulf regarding the removal of Plaintiff's left handcuff. *See* Dkt. 35-1 at 18, 38.

11

12

13

14

15

16

     At timestamp 9:04:14, the officer on the right can be seen handling something at the handcuff port. This appears consistent with Officer Wulf's testimony regarding his removal of the address book from Plaintiff's right hand. *See* Dkt. 35-1 at 36. At timestamp 9:04:21, the officer on the left gives a sharp tug, and can be seen pulling what appears to be the inmate's arm upward through the handcuff port. At timestamp 9:04:35, another officer arrives. The video then terminates.

17

18

19

20

21

22

23

24

     The second video, labelled "PROD 00000126," shows the interior of a cell. There is no sound. The camera placement is above and to the right side of the door and the handcuff port is not directly visible. At timestamp 9:04:00, an inmate enters with his hands cuffed behind him. At timestamp 9:04:02, a black object can be seen in the inmate's right hand, consistent with the address book described by Officer Wulf. *See* Dkt. 35-1 at 36. At timestamp 9:04:08, the inmate is seen making a slight pull forward with his body; he then stands with his back facing the door. At timestamp 9:04:12, the inmate brings his left hand into the cell and wipes his brow with his

left hand, which is no longer handcuffed. His right hand remains behind him. At timestamp

9:04:14, the inmate turns to the right, facing sideways, as his right hand moves slightly further

back; his left hand appears to move toward the cell door and cuff port. At timestamp 9:04:17, the

inmate returns to standing with his back to the door, his right arm behind his back and his left

arm by his side. At timestamp 9:04:21, the inmate's right side is suddenly pulled far back,

twisting his shoulders; the inmate bends over and can be seen to be breathing hard. At timestamp

9:04:41, the inmate's right arm is released; he begins banging his head on the door, and the video

ends.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate when the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The central issue is

"whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at

251–52.

The moving party bears the initial burden of showing "that there is an absence of

evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986). Where the moving party does not bear the burden at trial, it can carry its initial burden by

presenting evidence that negates an essential element of the nonmoving party's case, or by

establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden at

trial. *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir.

2000). Where the moving party bears the burden at trial, it can meet its initial burden by

1  presenting evidence sufficient to demonstrate that no reasonable trier of fact could find for the

2  nonmoving party; the evidence presented must establish beyond controversy every essential

3  element of the claim. *Southern Cal. Gas. Co. v. City of Santa Ana*, 336 F.3d 885, 888–89 (9th

4  Cir. 2003).

5       If the moving party meets its initial responsibility, the burden then shifts to the

6  nonmoving party to establish a genuine issue of material fact for trial. *Matsushita Elec. Indus.*

7  *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). Genuine disputes are those for which

8  the evidence is such that a "reasonable jury could return a verdict for the nonmoving party."

9  *Anderson*, 477 U.S. at 257. Material facts are those which might affect the outcome of the suit

10  under governing law. *Id.* A mere scintilla of evidence is insufficient to create a factual dispute.

11  *Id.* at 252. Likewise, the nonmoving party cannot "defeat summary judgment with allegations in

12  the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v.*

13  *Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

14       Allegations based merely on the Plaintiff's belief are insufficient to oppose summary

15  judgment, as are unsupported conjecture and conclusory statements. *Id.*; *McElyea v. Babbitt*, 833

16  F.2d 196, 197–98 n.1 (9th Cir. 1987). In ruling on a motion for summary judgment, the Court

17  must draw all reasonable inferences in favor of the nonmoving party, *Matsushita Elec. Indus.*

18  *Co.*, 475 U.S. at 587, and may not weigh the evidence or make credibility determinations,

19  *Anderson*, 477 U.S. at 248.

20       When parties file cross-motions for summary judgment, as the parties have done here, each

21  motion "must be considered on its own merits." *Fair Hous. Council of Riverside County, Inc. v.*

22  *Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The court must review the evidence submitted

23  in support of each cross-motion. *Id*. And, although the parties may each assert there are no

24

1    uncontested issues of material fact, the Court must determine whether disputed issues of material

2    fact are present. *Id.*; *Osborn v. Butler*, 712 F. Supp. 2d 1134, 1148 (D. Idaho 2010).

3    **B.      Section 1983 Standard**

4           In order to recover pursuant to 42 U.S.C. § 1983, a plaintiff must prove that: (l) the

5    conduct complained of was committed by a person acting under color of state law and (2) the

6    conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws

7    of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds,*

8    *Daniels v. Williams*, 474 U.S. 327 (1986). The causation requirement of § 1983 is satisfied only

9    if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's

10   affirmative act, or omitted to perform an act which he or she was legally required to do that

11   caused the deprivation complained of. *Arnold v. Int'l Bus. Machines Corp.*, 637 F.2d 1350, 1355

12   (9th Cir. 1981).

                           **III.      DISCUSSION**

13

14   **A.      Defendants' Motion to Strike**

15          As a preliminary matter, Defendants have moved to strike portions of a Declaration

16   submitted by Plaintiff. Dkt. 38 at 1–2. Specifically, Defendants contend paragraphs 3 and 5 of

17   the Supplemental Declaration of Kyle Payment (Dkt. 37) contain statements that are speculative

18   and not based upon personal knowledge. *Id*.

19          A court may consider only admissible evidence in ruling on a motion for summary

20   judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ.

21   P. 56(c). However, at the summary judgment stage, the Court is focused on the admissibility of

22   the content, rather than the form, of the evidence. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37

23   (9th Cir. 2003), *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("To survive

24

1    summary judgment, a party does not necessarily have to produce evidence in a form that would

2    be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil

3    Procedure 56.").

4        Objections to evidence because the evidence is irrelevant, speculative, argumentative,

5    vague and ambiguous, or constitutes an improper legal conclusion, are duplicative of the

6    summary judgment standard itself. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110,

7    1119-20 (E.D. Cal. 2006). Admissible declarations or affidavits must be based on personal

8    knowledge, must set forth facts that would be admissible in evidence, and must show the

9    declarant or affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4).

10    Accordingly, the Court declines to strike the challenged portions of Plaintiff's Supplemental

11    Declaration (Dkt. 37) but will only consider statements in the Declaration that meet the

12    requirements of Rule 56.

13    **B.    Defendant's Motion for Partial Summary Judgment**

14        Defendant seeks summary judgment dismissing Plaintiff's retaliation claim, one of

15    Plaintiff's two claims in this action. Dkt. 26 at 1. Defendant contends that (1) Plaintiff has not

16    established a triable issue of fact as to all of the elements of a First Amendment retaliation claim,

17    and (2) Defendant is entitled to qualified immunity as to the retaliation claim. Dkt. 26.

18        1.    <u>Retaliation Claim</u>

19        Defendant argues that he had no authority over the termination of Plaintiff's yard time

20    and therefore Plaintiff cannot establish the essential elements of adverse action, retaliatory

21    motive, causation, or a lack of a legitimate correctional goal. Dkt. 36 at 7; Dkt. 38 at 3. Plaintiff

22    responds that his retaliation claim rests upon a course of retaliatory conduct in addition to the

23    termination of his yard time—including Defendant's use of excessive force and issuance of a

24

false infraction—and that there are also issues of triable fact regarding the early termination of his yard time. Dkt. 36 at 4–6.

An allegation of retaliation for a prisoner's exercise of his First Amendment right to file grievances or to pursue litigation against prison officials may support a claim under § 1983; without this constitutional protection, inmates would be left without a viable mechanism to remedy prison injustices. *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005).

Plaintiff must prove five basic elements to prevail on such a claim of retaliation: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Id.* at 567–568. The plaintiff must also show the protected conduct was the substantial or motivating factor driving the prison official's conduct. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 286–287 (1977); *Brodheim v. Cry,* 584 F.3d 1262, 1271 (9th Cir. 2009).

Here, Defendant does not present any argument disputing the protected activity element. The Court therefore addresses only the first, second, fourth and fifth elements.

a.    *Adverse Action and Chilling Effect (Elements 1 and 4)*

Defendant's motion challenges only Plaintiff's claim that Defendant retaliated against him by terminating his yard time on the day after Plaintiff had filed a grievance, on the ground that Defendant had no decision-making authority over yard time. Dkt. 26 at 7.

Defendant has submitted evidence that prison procedures place the authority over an inmate's yard time solely upon the booth officer, and floor officers like Defendant do not count, control or monitor yard time and have no authority to cut such time short; instead, the time is measured by a computer system in the booth. Dkt. 28 at ¶¶ 6–9. Plaintiff has submitted a

1   Declaration disputing this testimony and asserting that the ordinary practice is the first inmate

2   brought to the yard is the first to be returned; plaintiff asserts this practice was not followed on

3   the day in question. Dkt. 37 at ¶ 3. Plaintiff also states that on that day, the floor officers

4   (including Defendant) were "solely responsible" for determining which inmates went to the yard

5   and when they would be escorted back to their cells. Dkt. 37 at ¶ 5.

6          Defendant contends this testimony is speculative and without foundation because

7   Plaintiff does not have personal knowledge of prison procedures and the division of authority.

8   Dkt. 38 at 2. The Court does not credit Plaintiff's evidence regarding prison policy, but does

9   accept his testimony regarding his personal experience—namely, that the first inmate brought to

10  the yard is usually the first to be returned, and that practice was not followed on the day in

11  question, resulting in ten minutes' loss of yard time. *See* Dkt.37 at ¶ 3; Dkt. 27-1 at 8 (Payment

12  Dep.). Moreover, Plaintiff has also submitted a grievance response by prison authorities stating

13  that "escorting employees decide what order incarcerated individuals are moved from cell to the

14  yard and vice versa." Dkt. 40-3 at 1. This evidence is sufficient to raise a question of fact

15  regarding whether Defendant cut short Plaintiff's yard time.

16         Moreover, Defendant's argument disregards the remainder of Plaintiff's claim—that

17  Defendant engaged in a course of conduct that, in addition to the early yard termination, also

18  included the use of excessive force and the initiation of a false infraction proceeding. *See* Dkt. 26

19  at ¶¶ 35, 36. Plaintiff has submitted video and testimonial evidence that Defendant implemented

20  a painful "gooseneck hold" when Plaintiff had appeared to be compliant. *See* Dkt. 30, Ex. E

21  (videos Prod 00000125 and 126) at timestamp 9:04:21; Dkt. 30-1 at 14 (Wulf Dep.); Dkt. 30-1 at

22  26 (Nonamaker Dep.). Defendant testified that he believes Plaintiff "pinched" Defendant's hand

23  and attempted to pull his right hand out of the cuff port. Dkt. 35-1 at 20. While the parties

24

1    dispute whether the "gooseneck" hold was justified, there is no dispute that Plaintiff was

2    subjected to it.

3        In addition, Plaintiff has submitted evidence that Defendant charged Plaintiff with the

4    "serious infractions" of staff assault and threatening staff injury during the use of force incident.

5    Dkt. 30-1 at 4, 13. The hearing officer ultimately found Plaintiff not guilty, finding the video

6    evidence "conflict[ed]" with Defendant's narrative. Dkt. 30-1 at 6. Defendant has not offered any

7    countervailing evidence supporting the infraction charge.

8        Plaintiff asserts that, even though he was found not guilty of the infraction, he suffered a

9    delay in his return to the general population from his IMU confinement. Dkt. 31 at ¶ 17. Plaintiff

10   also suffered pain and bruising from Defendant's use of force. Dkt. 31 at ¶ 12. Moreover, "the

11   mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the

12   threat itself can have a chilling effect." *Brodheim*, 584 F.3d at 1270. Here, the infraction charge

13   imposed the threat of a significant sanction upon Plaintiff, which could (and, Plaintiff testifies,

14   did) impose a chilling influence. Dkt. 40-1 at 8. *See Brown v. Crowley*, 312 F.3d 782, 789 (6th

15   Cir. 2002) (Even where the infraction is ultimately found to be without merit, "a reasonable jury

16   could conclude that being subjected to the risk of such severe sanctions for raising a legitimate

17   complaint 'would deter a person of ordinary firmness from continuing to engage in that

18   [protected] conduct.'").

19       The Court finds that there are triable issues of fact regarding the adverse action and

20   chilling effect elements of Plaintiff's retaliation claim.

21            b.    *Causation (Element 2)*

22       Defendant contends Plaintiff cannot establish the causation element, because Defendant

23   had no authority to cut Plaintiff's yard time short and Plaintiff has not supplied evidence of

24   retaliatory intent. Dkt. 38 at 4. Plaintiff emphasizes the timing of the alleged retaliatory events,

1    which occurred the day after he filed his grievance, as well as his evidence that Defendant had

2    admonished Plaintiff about his "dumb ass grievances." Dkt. 36 at 6.

3        Proof of retaliatory intent must usually be circumstantial. *See Watison*, 668 F.3d at 1114

4    ("because direct evidence of retaliatory intent rarely can be pleaded in a complaint, allegation of

5    a chronology of events from which retaliation can be inferred is sufficient to survive dismissal.").

6    While timing alone is not always sufficient, here, all three of the alleged retaliatory events

7    occurred the next day and only after Plaintiff had filed his grievance. Dkt. 31 at ¶¶ 2–4.

8    Moreover, Plaintiff states that when he complained about the first early termination of his yard

9    time, Defendant responded "maybe you shouldn't file your dumb-ass grievances and you

10   wouldn't have this problem." Dkt. 31 at ¶ 3.[4] When construed in the light most favorable to the

11   non-moving party, this evidence is sufficient to raise an inference of retaliatory intent. *Watison*,

12   668 at 1114.

13            c.    *Legitimate Correctional Goal (Element 5)*

14       Finally, Defendant contends Plaintiff has not established the fifth element of his

15   retaliation claim—whether Defendant's conduct reasonably advanced a legitimate correctional

16   goal.

17       Defendant testified that his use of force against Plaintiff was solely to "get the handcuff

18   back" from Defendant's right hand, which Defendant contends Plaintiff had pulled back into his

19   cell, and to "restore order." Dkt. 35-1 at 31. Plaintiff, on the other hand, asserts defendant

20   violently pulled his arm "without any provocation, and without providing me with any

21   commands." Dkt. 31 at ¶ 11. Moreover, Officers Wulf and Nonamaker testified they did not

22

---

[4] Defendant denies making this statement. Dkt. 27-1 at 19. Defendant also denies he was aware of Plaintiff's
23   grievance on the date it was filed. *Id*. at 18–19. Plaintiff has provided evidence that he submitted his grievance
directly to Defendant, and observed Defendant reading the document. Dkt. 31 at ¶ 2. At most, Defendant's evidence
24   demonstrates the existence of an issue of material fact precluding summary judgment.

1    observe (in the case of Officer Wulf) or see on the video (in the case of Officer Nonamaker) any

2    conduct by Plaintiff that would have justified Defendant's use of force. Dkt. 30-1 at 14, 26.

3    Thus, there is a dispute of material fact whether Defendant's use of force reasonably advanced a

4    legitimate correctional goal.

5            Issues of fact similarly remain as to the other retaliatory acts alleged by Plaintiff.

6    Defendant asserts he had no authority to terminate Plaintiff's yard time early, but does not

7    contend there was any correctional purpose for doing so. To the extent Defendant contends his

8    filing of the serious infraction against Plaintiff supported a correctional goal, the outcome of the

9    proceeding—namely, the findings that the video did not support the allegations—could raise an

10   inference that the charges might not have been justified. *See, e.g., Hargis v. Foster*, 312 F.3d

11   404, 411 (9th Cir. 2002) ("[a] jury could reasonably find that charging [plaintiff] with such a

12   severe disciplinary infraction as coercion was an 'exaggerated response' to conduct that posed, at

13   most, a de minimis risk to security.").

14           The Court finds there are issues of fact preventing the entry of summary judgment as to

15   Plaintiff's retaliation claim. The Court therefore considers whether Defendant is entitled to

16   summary judgment dismissing that claim based upon qualified immunity.

17           2.    Qualified Immunity

18           Defendant also argues that Plaintiff's retaliation claim should be dismissed because he is

19   entitled to qualified immunity. Dkt. 26 at 7–9.[5]

20

21   [5] Defendant's motion is expressly described as seeking "partial" summary judgment and requests dismissal only of
     Plaintiff's retaliation claim (Dkt. 26 at 1); moreover, the parties' briefing of Defendant's motion does not address
22   Plaintiff's Eighth Amendment claim. *See* Dkts. 36, 38. However, in his response to Plaintiff's cross-motion for
     summary judgment, Defendant appears to assert he is also entitled to qualified immunity as to Plaintiff's excessive
23   force claim. Dkt. 34 at 10. Defendant has not properly raised this argument as a motion for summary judgment.
     However, summary judgment would be inappropriate on this claim in any event. As discussed below, the Court
     finds that triable issues of fact remain as to that claim. *See* Section C. The video and other evidence in this record,
24   when construed in the light most favorable to Plaintiff, present an issue of fact as to whether Defendant applied
     unnecessarily severe force relative to any reasonably perceived threat. The law is clearly established that use of

1    Unless plaintiff makes a two-part showing, qualified immunity shields government

2    officials from liability for damages. The plaintiff must show: (a) the official(s) violated a federal

3    statutory or constitutional right; and (b) at the time of the alleged act or failure to act, there was

4    clearly established law that defined the contours of the federal right, such that every reasonable

5    official would understand that what they are doing is unlawful. *City of Escondido, Cal. v.*

6    *Emmons*, 139 S. Ct. 500, 503 (2019). When qualified immunity is reviewed in the context of a

7    defense motion for summary judgment, the evidence must be considered in the light most

8    favorable to the plaintiff with respect to central facts. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014)

9    (per curiam). Summary judgment is not appropriate where genuine issues of material fact prevent

10    a determination of qualified immunity. *Bonivert v. City of Clarkston*, 883 F.3d 865, 871–72 (9th

11    Cir. 2018).

12    The Court may analyze the two prongs of qualified immunity in either order. *Pearson v.*

13    *Callahan*, 555 U.S. 223, 236 (2009). With respect to the second prong, "[t]hough the

14    constitutional right must be clearly established such that 'a reasonable official would understand

15    that what he is doing violates that right,'. . . '[t]here need not be a case dealing with these

16    particular facts to find [the officer's] conduct unreasonable.'" *Scott v. Cnty. of San Bernardino*,

17    903 F.3d 943, 951 (9th Cir. 2018) (*quoting Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Doe ex rel.*

18    *Doe v. Hawaii Dep't of Educ.*, 334 F.3d 906, 910 (9th Cir. 2003)).

19

20

21

22    restraints to inflict pain violates the Eighth Amendment. *See, e.g., Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir.
1993) (affirming denial of qualified immunity where handcuffs were unnecessarily tight and defendants did not

23    loosen them after plaintiff's complaint); *Ajala v. Tom*, 658 Fed.Appx. 805, 806-807 (7th Cir. 2016) (reversing
qualified immunity dismissal because case law established that use of restraints to inflict pain on prisoners violated

24    the Eighth Amendment).

As discussed above, the Court finds there are triable issues of fact as to whether Defendant violated Plaintiff's First Amendment rights. The qualified immunity inquiry therefore focuses on the second prong.

Here, Plaintiff's claim asserts Defendant undertook a course of retaliatory conduct in response to Plaintiff's grievance activity—by prematurely terminating Plaintiff's yard time, engaging in an excessive use of force, and by falsely initiating prison discipline. Dkt 36 at 5. The law at the time of these actions was clear that even a threat of adverse action due to the filing of a grievance constitutes actionable retaliation. *Brodheim*, 584 F.3d at 1270–71 (officer's statement to grievant that "I'd like you to be careful what you write" constitutes adverse action with a chilling effect). Moreover, it is also clearly established that physical harm—or even the threat of such harm—and the initiation of unwarranted prison discipline in reaction to a grievance likewise constitute improper retaliation. *Watison*, 668 F.3d at 1115 (threat to hit grievant constituted actionable retaliation); *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017) ("we cannot condone" the initiation of prison discipline for raising grievances).

The facts submitted by Plaintiff—when viewed in the light most favorable to Plaintiff for purposes of this motion—could support a jury determination that Defendant's course of conduct violated his clearly established right to be free from retaliation. The Court therefore finds that Defendant is not entitled to summary judgment on qualified immunity grounds and, accordingly, recommends that Defendant's motion for partial summary judgment dismissing Plaintiff's retaliation claim be **DENIED**.

## C.     Plaintiff's Motion for Summary Judgment

Plaintiff seeks partial summary judgment finding liability on both of his claims. Dkt. 34 at 2.

1     1.     Excessive Force Claim

2          Plaintiff contends the evidence shows Defendant applied excessive force in executing the

3     "gooseneck" hold on Plaintiff's arm while removing his handcuffs. Dkt. 29 at 8–12.

4          The Eighth Amendment governs post-conviction excessive force claims:  the core inquiry

5     under the Eighth Amendment standard is whether the force was applied "in a good-faith effort to

6     maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v.*

7     *McMillian*, 503 U.S. 1, 6-7 (1992). The extent of the injury suffered by the plaintiff is a relevant

8     but not dispositive consideration. 503 U.S. at 7. While the Eighth Amendment does not reach *de*

9     *minimis* uses of physical force, a claim is not foreclosed merely because the resulting injury was

10    only minimal. 503 U.S. at 9-10; *Wilkins v. Gaddy*, 599 U.S. 34, 38-39 (2010).

11         In an excessive force claim, "[i]t is obduracy and wantonness, not inadvertence or error in

12    good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments

13    Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). The question turns on "whether force was

14    applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for

15    the very purpose of causing harm." *Id*. at 321 (cleaned up). Thus, an excessive force claim rests

16    upon whether Defendant had a subjectively wanton state of mind when he engaged in the use of

17    force, including considering the following factors:  (1) the need for the application of force; (2)

18    the relationship between that need and the amount of force used; (3) the threat reasonably

19    perceived by the defendants, and (4) any efforts made to temper the severity of a forceful

20    response. *Hudson*, 503 U.S. at 7.

21         Plaintiff relies upon the testimony of Officers Wulf and Nonamaker that they did not

22    observe Plaintiff engaging in behavior that would justify the use of the "gooseneck" procedure.

23    *See* Dkt. 30-1 at 14, 26. Plaintiff further argues that the surveillance videos clearly contradict

24

REPORT AND RECOMMENDATION - 22

1    Defendant's version of events as stated in his Serious Infraction Report, and argue the Court

2    should credit the videos, rather than the version of events Defendant set forth in his Serious

3    Infraction Report. Dkt. 29 at 11–12, citing *Scott v. Harris* 550 U.S. 372, 380-81 (2007).

4          Defendant argues that his state of mind presents an issue of fact, which is not resolved by

5    the evidence of Officers Wulf and Nonamaker, whose testimony was based upon Department of

6    Corrections policy, not Federal constitutional principles. Dkt. 34 at 9. Defendant further argues

7    that the presence of video evidence does not change the requirement that, as the non-moving

8    party, any inferences—including inferences from the video—must be drawn in his favor.

9          Defendant testified that he felt Plaintiff was trying to pull his right hand, with its still-

10   attached handcuff, into the cell. Dkt. 35-1 at 18–19. Defendant also testified that Plaintiff

11   pinched the top of his hand as Defendant was trying to reach Plaintiff's hand. *Id*. Defendant

12   states he was "fighting [Plaintiff] for control of his hand at the handcuff port" and applied force

13   because he "just wanted to get the handcuff back." *Id*. at 22, 31. The opinions of Defendant's

14   fellow officers—who had neither first-hand contact with Plaintiff nor knowledge of Defendant's

15   state of mind—do no more than to raise a question of fact as to whether Defendant's perceptions

16   were mistaken. But Plaintiff must prove Defendant acted with a subjectively wanton state of

17   mind, not out of mistaken belief. *Whitely*, 475 U.S. at 319. Defendant has submitted evidence

18   which, construed in the light most favorable to him, raises an issue of fact as to whether he was

19   acting with the required subjectively wanton state of mind when he applied force.

20         Where videotape evidence contradicts the version of events asserted by one party, "the

21   court must 'view[] the facts in the light depicted by the videotape.'" *Scott*, 550 U.S. at 380-81

22   (2007). However, video evidence remains subject to the summary judgment standard requiring

23   that all reasonable inferences must be drawn in favor of the non-moving party. *Blankenhorn v.*

24

1    *City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007). Where the evidence of the non-moving

2    party is not "blatantly contradicted by the video evidence, . . . the mere existence of video

3    footage of the incident does not foreclose a genuine factual dispute as to the reasonable

4    inferences that can be drawn from that footage." *Vos v. City of Newport Beach*, 892 F.3d 1024,

5    1028 (9th Cir. 2018).

6         Here, the video evidence does not blatantly contradict Defendant's evidence and is,

7    instead, inconclusive.[6] While the video footage appears to corroborate Plaintiff's version of

8    events, it does not directly show the handcuff port. As such, it cannot be definitively determined

9    whether Plaintiff's right hand moved away from the port, as Defendant testified. Dkt. 30, Ex. E,

10   PROD 00000126. Moreover, the footage shows an instance of Plaintiff slightly pulling away

11   from the door. *Id.* at minute marker 9:04:08. The video also shows a moment in which Plaintiff

12   turns sideways, his right arm is pulled slightly back, and Plaintiff's left arm appears to reach

13   toward the handcuff port. *Id.* at minute marker 9:04:14. The latter footage, viewed in the light

14   most favorable to Defendant, could be consistent with Defendant's perception that Plaintiff was

15   pulling on the right handcuff, and with Defendant's report that one of Plaintiff's hands "pinched"

16   Defendant. Both instances could be viewed by the trier of fact as supporting Defendant's

17   perception (even if mistaken) that Plaintiff was pulling on the handcuffs.

18        Viewing the evidence in the light most favorable to Defendant, and drawing all

19   inferences in his favor, the Court finds that triable issues of fact remain as to Defendant's state of

---

[6] The Court notes that Defendant's testimony in this case varies from his narrative in his Serious Infraction Report, which the Hearing Examiner found was not "consistent" with the video. *See* Dkt. 30-1 at 6. Defendant does not contend, as he did in the Serious Infraction Report, that Plaintiff grabbed his arm or attempted to strike him; instead, he asserts Plaintiff "pinched" his hand and attempted to pull his right arm away from the handcuff port. *Compare* Dkt. 30-1 at 4 *with* Dkt. 35-1 at 18.

1    mind when he applied the "gooseneck" hold. The Court therefore recommends Plaintiff's motion

2    for summary judgment finding liability as to his Eighth Amendment claim be **DENIED**.

3            2.    <u>Retaliation Claim</u>

4            As discussed in Section B above, the Court finds that issues of fact remain regarding each

5    of the contested elements of Plaintiff's retaliation claim, when the evidence is construed in the

6    light most favorable to Plaintiff. The outcome is no different when, as is required to grant

7    summary judgment on Plaintiff's behalf, the Court construes the evidence and draws all

8    inferences in the light most favorable to Defendant.

9            The evidence regarding, at least part of, Plaintiff's adverse action allegation is contested.

10   In particular, Defendant submitted evidence that under established policy he had no authority

11   over, and did not track, Plaintiff's yard time—and therefore could not have intentionally

12   abbreviated it. Dkt. 28 at ¶¶ 6–9. Plaintiff's submission of conflicting evidence merely raises a

13   question of fact that the jury must resolve.

14           Triable issues similarly remain regarding the elements of causation and the pursuit of

15   legitimate correctional goals. Defendant has submitted evidence that he was not aware of

16   Plaintiff's October 3, 2019, grievance until at least a week after it was submitted, and, therefore,

17   could not have acted out of retaliatory intent on October 4th. Dkt. 27-1 at 18–19, 25. Defendant

18   also denies any discussion with or comment to Plaintiff about his grievances, and denies he had

19   any retaliatory intent. Dkt 27-1 at 19, 25. Defendant has also submitted testimony that he used

20   force during the handcuff removal process because he believed Defendant attempted to pull his

21   right hand into his cell and pinched his hand, and he was merely attempting to restore order. Dkt.

22   35-1 at 31. While Plaintiff has submitted contrary evidence, these issues must be resolved by the

23   trier of fact, not by this Court.

24

1    Because triable issues of fact remain as to necessary elements of Plaintiff's retaliation

2    claim, the Court recommends Plaintiff's motion for summary judgment on this claims be

3    **DENIED**.

4                                    **IV.    CONCLUSION**

5          For the reasons discussed above, the Court recommends that both Defendant's motion for

6    partial summary judgment (Dkt. 26) and Plaintiff's motion for partial summary judgment (Dkt.

7    29) be **DENIED**.

8          Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), the parties

9    shall have fourteen (14) days from service of this report to file written objections. *See also* Fed.

10   R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of

11   *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of

12   those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda*

13   *v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time

14   limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on

15   November 10, 2023, as noted in the caption.

16         Dated this 25th day of October, 2023.

17

18

19                                         Grady J. Leupold
                                           United States Magistrate Judge
20

21

22

23

24